KING, et al. *v.* MISSISSIPPI POWER & LIGHT COMPANY

No. 42370 June 11, 1962 142 So. 2d 222

*Odom, Odom & Pittman,* Greenwood, for appellants.

*Bell & McBee,* Greenwood; *Green, Green & Cheney,* Jackson, for appellee.

Rogers, J.

The declaration in this case charges that on June 1, 1960, at approximately 5 P. M. during a rain shower or electrical storm, one of the defendant's uninsulated high voltage power lines broke into two pieces so that one of the loose ends fell on the ground and across the plaintiffs' pasture fence; that the fence became immediately charged with electricity; that a part of plaintiffs' herd of cattle were standing near and in contact with the fence; and that eight cows were killed instantly.

It is further charged that within approximately ten minutes after the death of the cattle the defendant was notified by telephone of the incident and the electrocution of the cattle; that a request was made of the defendant for immediate action in order to permit the removal of the cattle from the fence so that they might be prepared for food purposes; that within twenty minutes after the killing, Albert King was present at the scene prepared to process the cattle for food purposes; that the defendant took no action to cut off the electrical power; that plaintiff again notified the defendant of the situation but that defendant completely ignored his request for access to the cattle; that the local manager of the sub-station came to the scene, observed the stricken cattle, but negligently failed to advise that the cattle could be removed.

The declaration further charges that if the stricken cattle could have been removed within thirty minutes after death, the meat could have been properly prepared for food purposes, but that the plaintiff was de-

nied access to the cattle for a period of two hours after the occurrence.

It is further charged that the defendant dispatched all of its repairmen to a distant area and left no one at its headquarters qualified to cope with the situation; that defendant's facilities would have permitted the cutting off of the power but this was not done because no capable employee was available.

There is a general charge in the declaration that "defendant was guilty of negligence which directly and proximately caused the death of said cattle and the loss of said meat therefrom, in that defendant failed to maintain said power line in such a state of repair as to prevent said line * * * from falling across said pasture fence * * *'' Following the above allegation, without further explanation, the pleader goes directly to the previous allegations of failure on the part of the defendant to act on the knowledge of the condition within a reasonable time so that the plaintiff could utilize the dead cattle for meat purposes.

This declaration does not charge general negligence on the part of the defendant in connection with the installation, maintenance and repair of the line. There is no suggestion that, on account of the way and manner in which it was erected or maintained, damage would reasonably follow as a result of an electrical or windstorm. In other words, there is no attempt to rest liability on any doctrine of general negligence. The litigation is based upon negligence on the part of the appellee after it had notice of the damage for failing to cut off the electric power which is said to have been the proximate cause of appellants' loss. The brief of the appellants makes no claim of error on the part of the trial court because of any alleged right that plaintiff might have had to recover damages because of general negligence. The sole basis upon which liability is predicated is that after the cattle were electrocuted

by the current from appellee's power lines, notice was given to the company immediately and it negligently failed to de-energize the line for such length of time that the value of the cattle, for food purposes, was destroyed. The general allegations of negligence that appellee failed to maintain its power line in such state of repair as to prevent such line from falling across the pasture fence does not meet the requirement of Sec. 1464, Miss. Code 1942, Rec.

This Court, in the case of City of Hattiesburg v. Hillman, Adm'x, 222 Miss. 443, 76 So. 2d 368, in quoting from 65 C. J. S., Negligence, Sec. 21 (b), pp. 432-433, said that an act ''which may be prevented by the exercise of ordinary care is not an act of God.'' It is nevertheless true that the allegation of negligence set out in the declaration in the case now before the Court is not sufficient to establish a cause of action showing negligence of appellee prior to the electrocution of the cattle. █ A mere charge of negligence does not demonstrate actionable negligence. Brown, et al. v. City of Vicksburg, et al., 108 Miss. 510, 66 So. 983. Moreover, the pleadings will be construed most strongly against the pleader. Sharp v. Learned, 182 Miss. 333, 181 So. 142. It is not sufficient to allege negligence as a mere conclusion of the pleader, but facts must be pleaded showing actionable negligence. Horton v. Lincoln County, 116 Miss. 813, 77 So. 796; Perry v. Standard Oil Company, 15 F. Supp. 563 (D. C. Miss.); Stokes v. Great Southern Lumber Company, 21 Fed. 2d 185 (D. C. Miss.); 71 C. J. S., Pleading, Sec. 13, p. 34.

Appellee asserts that the meat of cattle killed by electrocution is ''unwholesome as a matter of law''; that there is no value in unwholesome food, and therefore it is not liable for its alleged failure to have de-energized its power lines or to have notified appellants that the power lines were de-energized in time for them to have utilized the meat for human food. Appellee sug-

gests that the following Sections of Miss. Code 1942, Rec., substantiate its contention: 2336, 2338, 4575-01-20, 7108 (Sixth) and 7122.

██ ■ It is apparent from an examination of Secs. 2336, 2338, Miss. Code 1942, Rec., that these two sections are criminal statutes, and under them one may be punished for the "sale" of animals "dying otherwise than by slaughter", "slaughtered when diseased", and "sell, or offer for sale * * * flesh of any animal which shall have died a natural death." There is no word used in either of these two sections to indicate that the Legislature intended to make it a crime for the owner to use the carcass of an animal therein described. ██ ■ The courts will not interpret a criminal statute so as to make an act a crime unless it is clear that such was the intention of the Legislature. 22 C. J. S., Criminal Law, Sec. 24 (2), p. 62.

Sec. 4575-02 (c) defines the term "food unfit for human consumption" to be "meat and meat-food products which are so affected with disease that it would be dangerous to use the meat or other parts for human food; also all meats or meat-food products which are contaminated, putrid, unsound, unhealthful, or otherwise unfit for food, or which have been derived from any animal which has died as a result of disease or accident, or which was in a dying condition at the time of slaughter." It is suggested that the words "which has died as a result of * * * accident", mean that the meat is food "unfit for human consumption" if killed by "accident", and therefore has no value. The foregoing section of the code is found under the "Definitions of terms" of the Meat, Meat-Food and Poultry Regulation and Inspection Act of 1960, Chap. 141; Laws 1960, p. 115. The title of the act shows that it is an act "to provide for the licensing and regulation of any person engaged in manufacturing, slaughtering, eviscerating, preparation, handling, storage, sale, and pos-

session of animals to be used for meat, meat-food products and poultry * * *''. Sec. 19 of this Act provides for the punishment of any person violating the act and says: ''Should the person continue to refuse to comply with the terms of this act and shall continue to engage in any of the businesses covered by this act, the commissioner is authorized and directed to obtain an injunction against such violator from the chancery court * * *''.

██ ██ The foregoing Meat, Meat-Food and Poultry Regulation and Inspection Act refers to ''establishments'', to ''carry on businesses'' of such establishments or ''govern the business covered by this Act.'' Sec. 3 provides that there shall be no rules inconsistent with the rules of U. S. Department of Agriculture ''governing the businesses covered by this Act.'' Sec. 16 provides that ''Any person engaged in any of the businesses covered by this act may obtain from the commissioner of agriculture a grading service * * *''. This section also states: ''However, no grade or quality shall be established or designated which will permit the sale of any meat, meat-food products or poultry unfit for human consumption.'' It is apparent from the wording of the various sections of Chap. 141, Laws 1960, that it was enacted for the purpose of licensing and regulating persons engaged in the business of manufacturing, slaughtering and preparing animals to be used for meat and meat-food products to be sold, and does not apply to wholesome meat accidentally killed and prepared for the owner's use.

Appellee points out that Sec. 7108 (Sixth) says an article of food shall be deemed to be adulterated ''* * * If it contains of or is manufactured * * * from a diseased * * * animal * * * substance * * * produced, stored, transported or kept in a condition that would render the article * * * unwholesome * * *

or the product of an animal that has died otherwise than by slaughter * * *''.

 It is also suggested that Sec. 7122, Code of 1942, Rec., is intended to mean that any animal ''dying otherwise than by slaughter'' is unfit for human consumption and is forfeited to the county. This section is in the following language: ''If any person shall sell, *keep,* or offer for sale any adulterated food or drug, the whole of the adulterated article shall be forfeited to the county.'' (Emphasis supplied.) We are of the opinion, however, that this section must be read in conjunction with other sections of Chap. 6, Code 1942, Rec., Health and Quarantine, particularly Sec. 7120, in which the word ''keep'' is also set apart with a comma, but which is explained by the words ''shall be forfeited to the county wherein the same may be offered *or kept for sale.''* (Emphasis supplied.) The word ''keep'', as used in Sec. 7122, Code 1942, Rec., therefore means ''keep for sale.''

In its brief on the question of wholesomeness of human food, appellee has called our attention to the Bible (Leviticus 11; 39-11-40) with reference to the uncleanliness of persons who handle carcasses of dead animals. We would point out that under this same Law (Leviticus 11:22) grasshoppers and locust were recommended as human food, and were in fact considered a delicacy. Moreover, in the light of common knowledge, one would undertake a Herculean task, to try to convince a Mississippi farmer that he could not prepare and eat a chicken he had accidentally killed with a stick of stovewood or had run over with an automobile.

 We are of the opinion that the foregoing code sections and Chap. 141, Laws 1960, refer to the inspection, sale, manufacture, keeping for sale and preparation for sale of unwholesome meat and poultry as therein described, and that these sections have no application to the use for food, by the owner, of meat from healthy cattle, although such cattle were accidentally killed.

■■ Appellee argues that the demurrer was properly sustained because of certain facts asserted by appellee. It is said the appellant could not possibly eat the flesh of eight cows, and that in the light of common sense it was the intention of appellants to prepare these illegally killed carcasses for food for the public. It is said that the Power Company remedied the dangerous situation almost immediately through the action of its automatic circuit breakers. It is also argued that there must be a transfer from one partner to another "before the party assuming to enjoy this questionable feast could have delighted therein." The foregoing allegations in defense of the charge made in the declaration are questions of fact for the consideration of the jury. Sec. 1455, Miss. Code 1942, Rec.; Mississippi Power & Light Company v. Merritt, 194 Miss. 794, 12 So. 2d 527; Williamson v. F. W. Woolworth Company, 237 Miss. 141, 112 So. 2d 529.

■■ When a demurrer is presented to a trial court, only the declaration and the demurrer are looked to, and the latter cannot be aided by an answer or other pleading. White v. Turner, 197 Miss. 265, 19 So. 2d 825.

■■ Moreover, on demurrer, all material allegations in a declaration are considered as true. Delano v. Holly-Matthews Mfg. Co., 47 So. 475 (Miss.); State, ex rel. John Baker v. Nichols, 106 Miss. 419, 63 So. 1025; Tillman v. Richton Tie and Timber Co., 224 Miss. 789, 80 So. 2d 745; Williams v. Williams, 185 Miss. 53, 187 So. 209.

We are of the opinion, and so hold, that this case should be reversed. The judgment of the lower court sustaining the demurrer to the declaration is therefore set aside, and a trial granted on the issue joined between plaintiffs and defendant in the trial court.

Reversed and remanded.

*Lee, P. J.,* and *Arrington, McElroy* and *Jones, JJ.,* concur.